Kern A. REESE, et al.

v.

ICF EMERGENCY MANAGEMENT
SERVICES, INC., L.L.C.

Civil Action No. 09–312–JJB.

United States District Court,
M.D. Louisiana.

Feb. 2, 2010.

Kern A. Reese, New Orleans, LA, pro se.

Dorothy Reese, New Orleans, LA, pro se.

Michael C. Drew, Thomas A. Casey, Jr., Jones, New Orleans, LA, Thomas L. Watson, II, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Daniel Thomas Plunkett, McGlinchey Stafford, New Orleans, LA, Christine Lipsey, McGlinchey Stafford, PLLC, Baton Rouge, LA, for Defendants.

## RULING

JAMES J. BRADY, District Judge.

The Court has carefully considered the motion, the record, the law applicable to this action, and the Report and Recommendation of United States Magistrate Judge Christine Noland, dated November 6, 2009 (doc. 29). Plaintiffs have filed an objection, which the Court has considered in conducting a *de novo* review of the record.

The Court finds that the magistrate judge's findings of fact and conclusions of law are all clearly correct and that there is no need to further address Plaintiff's arguments. Specifically, the Court finds that the magistrate judge appropriately pierced the pleadings in undertaking a summary inquiry. *See Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 573 (5th Cir.2004). Based on this limited inquiry, the magistrate judge found, and the Court agrees that Plaintiffs have no reasonable basis of recovery against the in-state defendants. Thus, the Court hereby approves the report and recommendation of the magistrate judge and adopts it as the Court's opinion herein. Accordingly,

IT IS ORDERED that Plaintiff's motion for remand to state court (doc. 22) is DENIED.

## NOTICE

CHRISTINE NOLAND, United States Magistrate Judge.

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 10 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report. The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 10 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

## MAGISTRATE JUDGE'S REPORT

This matter is before the Court on the Motion for Remand to State Court (R. Doc. 22) filed by plaintiffs, Kern A. Reese and Dorothy F. Reese (collectively "plaintiffs"). The removing defendants, ICF Emergency Management Services, Inc., L.L.C. ("ICF"), Frank Abramcheck, Al Blankenship, Donna Migoni, and Roland Bassett (collectively "ICF defendants"), as

well as the non-diverse defendants, Rebekah Cambre ("Cambre"), Agatha Marshall ("Marshall"),[1] and Joan Greer ("Greer")("non-diverse defendants" or "non-diverse Quadel defendants"),[2] have filed oppositions (R. Docs. 27 and 28) to plaintiffs' motion.

## FACTUAL & PROCEDURAL BACKGROUND

This suit arises out of an application for Road Home Program benefits filed by the plaintiffs on April 27, 2007. Plaintiffs filed that application as the alleged assignees of all rights, title and interests in a home originally owned by James Bernard Esposito ("Esposito"). Plaintiffs purchased the home at issue from the Estate of Esposito on December 29, 2005, prior to the Road Home Program being created but after the landfall of Hurricane Katrina. After the Road Home Program was created, plaintiffs filed their benefits application along with paperwork indicating that they had purchased the home at issue from the Estate of Esposito; that they had been assigned all rights, title, and interest of Esposito's estate that the Estate, as assignor, had, has, or may have, at any time, under the Road Home Program; and that Esposito had owned the home at the time of Hurricane Katrina.

According to the petition in this matter, the plaintiffs' application for benefits was initially approved, and the plaintiffs were found eligible for benefits under the Road Home Program Homeowner Policies. Specifically, plaintiffs contend that both Taylor Ransom ("Ransom") and her supervisor, Michelle Gallipoli ("Gallipoli"), employees of Quadel who handled the plaintiffs' benefits application,[3] shared the

---

1. Agatha Marshall was incorrectly named "Egatha Edwards" in the petition and "Agatha Edwards" in the Notice of Removal.

2. The non-diverse defendants are also referred to as the "non-diverse Quadel defendants" because they were employed by Qua-

del Consulting Corporation ("Quadel") during the time period in question.

3. ICF is the company that contracted with the State of Louisiana on June 12, 2006, to operate the Road Home Program. Such contract contained a description of services ICF was to provide, which included determining eligibili-

opinion that the plaintiffs' application was eligible for benefits under an "internal implementation policy" that had been developed on an *ad hoc* basis as a supplement to the official, published Road Home Program policies and procedures.[4] Nevertheless, plaintiffs contend that Gallipoli was ordered by her superiors (the non-diverse defendants) to change the determination of eligibility on the plaintiffs' application from eligible to ineligible or face termination.[5]

According to the petition, despite plaintiffs' efforts to comply with the eligibility requirements and Road Home Program policy, on August 20, 2007, plaintiffs received notice from ICF that their application was ineligible for benefits for the following reason:

> **OWNERSHIP:** To be considered eligible, you must have owned the property as of the date of the storm that damaged the property (August 29, 2005 if Hurricane Katrina or September 24, 2005 if Hurricane Rita). Based upon our review of your application, you were not the owner of record for the home at the time of the storm.

On August 29, 2007, plaintiffs objected to that ineligibility notice in writing because of their "confusion and dismay" brought about by the "conflicting pronouncements" concerning their eligibility status. Plaintiffs then filed an administrative appeal of the benefits determination, which was denied by ICF on February 22, 2008. Plaintiffs next filed a "state appeal" with the Office of Community Development ("OCD"). As of the filing of this suit, no decision had been made or forwarded to plaintiffs concerning their state appeal. However, plaintiffs note in their present motion that, on the same day that the petition in this matter was served upon defendants, they received a phone call from the OCD informing them that the OCD had denied their state appeal, but that an "Exceptions Panel" within the

---

ty for Road Home benefits. Quadel was a subcontractor employed by ICF that assisted ICF in carrying out the services set forth in its contract with the state, including benefit eligibility determinations.

4. Plaintiffs contend that the published policies and procedures of the Road Home Program could not possibly cover every conceivable situation and were in a "constant state of flux." They contend that certain "internal implementation policies" were therefore developed to assist with the implementation of the published policies in certain instances. In the present case, plaintiffs allege that, although the published policies of the Road Home Program required the assignor/original homeowner to make the application for benefits in order for an assignee of those benefits to be eligible, an "internal implementation policy" had been developed and routinely applied, whereby an assignee would be determined eligible for benefits as long as the original homeowner would have been eligible, even though the assignee, and not the original homeowner, had filed the application. Plaintiffs assert that such "internal implementation policy" was followed in designating hundreds of assignees who had filed their applications (rather than original homeowners) as eligible for Road Home Program benefits. They contend that such policy was in effect when they filed their application and was the basis for *initially finding their application eligible for benefits.*

5. Specifically, plaintiffs contend that Gallipoli was instructed by the non-diverse defendants to change the Reese application's designation from eligible to ineligible in direct conflict with the internal implementation policy of the program which had been followed in determining that hundreds of previous application filed by similarly-situated assignees were eligible for benefits. Plaintiffs contend that the reason Gallipoli was given by the non-diverse defendants for changing the eligibility determination on the Reese application was that *the Road Home Program, in general, and Quadel and ICF, in particular, were under tremendous pressure to process applications* and that eliminating applications such as the Reese application would reduce the number of back-logged applications.

state appeals process had reviewed the appeal and determined the plaintiffs' application was eligible for benefits. Although plaintiffs have apparently received a copy of the OCD's benefits denial and the "Exceptions Panel" determination dated March 29, 2009 from ICF's counsel, they have not received any official documentation directly from the OCD regarding either of those determinations.

On April 20, 2009, plaintiffs filed the present suit against the ICF defendants and the non-diverse defendants identified above, alleging, among other things, violations of the Louisiana Unfair Trade Practices Act ("LUPTA"), La. R.S. 51:1401, *et seq.*, and La. Civ.Code Art. 2315. Plaintiffs contend that the defendants breached their duty to not cause harm to the plaintiffs under La. Civ. C. Art. 2315. *See,* Petition, at ¶ 30. They allege that the actions giving rise to the breach of duties to determine eligibility of applicants for benefits in accord with the Road Home Program and to not cause harm to others, include the non-diverse defendants' "improper declaration of [their] Application to be ineligible for Road Home Program benefits, when it was in fact eligible, in order to meet certain quotas or deadlines set by the state for processing applications." *See,* Petition, at ¶ 19 ("Mr. and Mrs. Reese's claim, which was eligible at the time it was filed, ... was intentionally changed by defendants to make the Reese claim ineligible to wrongfully deny the claim as well as others to meet the bonus deadline").

The petition also alleges that the ("[d]efendants' scheme was intended to and did injure [the] plaintiffs by artifice and deceit, which resulted in the defendants receiving a $2,000,000.00 bonus, and Mr. and Mrs. Reese suffering the loss of funds that they were eligible to receive, as Road Home Program representatives had already de-

termined"). *See,* Petition, at ¶ 25. Specifically, Paragraph 10 of the petition alleges that non-diverse defendants, Greer and Marshall, personally directed Gallipoli to reverse the determination of eligibility and to render the plaintiffs' application ineligible.

Plaintiffs further contend, in Paragraph 24 of the petition, that the non-diverse defendants breached their duty to report wrongful conduct and/or improper application processing. Alternatively, plaintiffs contend that the defendants are liable in unjust enrichment pursuant to La. C.C. art. 2298, as a result of defendants' receipt of bonuses and other remuneration at the expense of the plaintiffs, resulting from the deliberate and wrongful reversal of the eligibility determination on their application. *See,* Petition, at ¶ 26. Plaintiffs further contend, in Paragraph 28 of the petition, that the fraud and other tortious conduct committed during the application process for benefits is actionable under Louisiana substantive law. Thus, based upon the allegations in the plaintiffs' petition, it appears that they have asserted four (4) causes of action: (1) negligence, (2) delictual fraud, (3) a LUPTA violation, and (4) unjust enrichment.

The ICF defendants removed plaintiffs' suit to this Court on May 22, 2009, on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332 and 28 U.S.C. §§ 1441 and 1446.[6] In their removal notice, they contend that the non-diverse defendants, Greer, Marshall and Cambre, have been fraudulently or improperly joined in this matter and that their citizenship should therefore be disregarded in determining whether diversity jurisdiction exists. Because complete diversity of citizenship exists among the remaining parties, the ICF defendants contend that removal is proper. The plaintiffs have now filed the present motion, wherein they contend that this

6. Counsel for the non-diverse defendants consented to the removal in writing.

matter should be remanded to state court because they have viable claims against the non-diverse defendants, which destroy complete diversity of citizenship.[7] In addition to an order remanding this case to state court, plaintiffs also seek an award of the reasonable attorney's fees and expenses they have had to incur as a result of the ICF defendants' alleged improper removal.

## LAW & ANALYSIS

### I. Applicable legal standard—Fraudulent or improper joinder:

 The removing party carries a heavy burden when attempting to prove fraudulent joinder. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 312 (5th Cir.2002). If there is arguably a reasonable basis for predicting that state law might impose liability on the facts involved, there is no fraudulent joinder. *Travis v. Irby,* 326 F.3d 644, 648 (5th Cir.2003).[8] In determining whether there is an arguably reasonable basis for the plaintiffs' claims, a district court must resolve any contested issues of material fact and any ambiguity or uncertainty in the controlling state law in the plaintiffs' favor. *Griggs v. State Farm Lloyds,* 181 F.3d 694, 699 (5th Cir.1999). If there is

any possibility the plaintiffs have stated a cause of action against any non-diverse defendant, the court must conclude that joinder is proper, thereby defeating diversity and requiring the case to be remanded. *Sid Richardson Carbon & Gasoline Co. v. Interenergy Resources, Ltd.,* 99 F.3d 746, 751 (5th Cir.1996).

 The Fifth Circuit Court of Appeals has recognized that a court may determine whether a plaintiff has a reasonable basis of recovery under state law in one of two ways. *Smallwood v. Illinois Cent. R. Co.,* 385 F.3d 568, 573 (5th Cir.2004). A court may conduct a Rule 12(b)(6)-type analysis, looking initially at the allegations in the complaint to determine whether the complaint states a claim under state law against the in-state defendant.[9] Ordinarily, if a plaintiff can survive a Rule 12(b)(6) challenge, improper joinder does not exist. However, there are cases, where a plaintiff has stated a claim, but has misstated or omitted discrete facts that would determine the propriety of joinder, and in such cases, the court may, in its discretion, pierce the pleadings and conduct a summary inquiry by examining outside evidence.[10] *Id.; McDonal v. Abbott Laboratories,* 408 F.3d 177, 183, n. 6 (5th Cir. 2005). A court may examine affidavits,

---

7. The dispute relative to plaintiffs' remand motion relates solely to whether or not the non-diverse defendants have been fraudulently or improperly joined, precluding complete diversity of citizenship; there is no dispute concerning whether the requisite amount is in controversy for purposes of diversity jurisdiction.

8. This does not mean that any mere theoretical possibility of recovery, no matter how remote or fanciful, prevents removal. *Badon v. RJR Nabisco Inc.,* 236 F.3d 282, 286, n. 4. To preclude a finding of fraudulent joinder, the basis for recovery must at least be arguably reasonable. *Id.*

9. When reviewing a motion pursuant to Fed. R.Civ.P. 12(b)(6), a court "must accept all

well pleaded averments as true and view them in the light most favorable to the plaintiff. [The court] will not go outside the pleadings and ... cannot uphold the dismissal 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief.' " *Hernandez v. Maxwell,* 905 F.2d 94, 96 (5th Cir.1990).

10. Under a summary judgment-type inquiry, a court is to "pierce the pleadings to determine whether, under controlling state law, the non-moving party has a valid claim against the non-diverse parties." *Hornbuckle v. State Farm Lloyds,* 385 F.3d 538, 542 (5th Cir. 2004).

evidence, and deposition testimony to determine whether the plaintiff has a reasonable basis of recovery against the non-diverse defendants. *Mclin v. H & H Lure Co.*, 102 F.Supp.2d 341, 343 (M.D.La.2000).

## II. Legal standard applied to present case:

The pivotal issue relative to the plaintiffs' motion to remand is whether or not there is an arguably reasonable basis for predicting that state law might impose liability upon the three (3) non-diverse defendants named in plaintiffs' petition, Greer, Marshall, and Cambre. Although, as discussed above, such issue can often be resolved simply by examining the allegations in the petition, the Court finds that it must proceed further than an examination of the plaintiffs' petition in this matter. The plaintiffs themselves requested and were granted an extension of time within which to conduct remand-related discovery in this case "on factual matters relating to certain of the allegations in the petition." Such discovery included taking the depositions of the three (3) non-diverse defendants and obtaining declarations from plaintiff, Kern Reese, and from Gallipoli and Ernest P. Legier, Jr., two employees of Quadel. Since such remand-related discovery supplies discrete facts that were not included in the plaintiffs' petition and that are central to the determination of whether plaintiffs have a reasonable possibility of recovering from the non-diverse defendants, the Court will consider both the allegations in the petition and the remand-related discovery in determining whether improper joinder has occurred under the summary judgment-type inquiry allowed by the Fifth Circuit's decision in *Smallwood.*

## III. Analysis:

In their oppositions to the plaintiffs' motion to remand, the defendants first contend that, in light of the allegations in the plaintiffs' petition and the remand-related discovery, it is evident that plaintiffs' negligence, fraud, and LUPTA claims are time-barred. Defendants secondly assert that there is no basis for plaintiffs' claim against the non-diverse Quadel defendants for unjust enrichment. Defendants base those arguments upon three (3) basic, undisputed facts derived from the plaintiffs' allegations in the petition and from the non-diverse defendants' depositions. First, according to plaintiffs' own allegations in their petition, a notice was sent to them by ICF on August 20, 2007, declaring their benefits application ineligible, and that notice was received by the plaintiffs by at least August 29, 2007, since, on that date, they objected to the ineligibility determination in writing, based upon their "confus[ion]" and "dismay" over the "conflicting pronouncements" concerning their eligibility status. *See,* Petition, ¶ 11–12. Secondly, despite plaintiffs' allegation to the contrary,[11] the three non-diverse defendants, all of whom were employed by Quadel during the relevant time period, have never been a part of ICF management and have never taken part in decisions by ICF's management,[12] and thirdly, none of the three non-diverse defendants have ever even heard about the alleged $2,000,000 bonus scheme,[13] nor did

---

**11.** In Paragraph 1 of the petition, the plaintiffs incorrectly allege that the non-diverse Quadel defendants were "member[s] of the management staff, ICF."

**12.** Cambre later became employed by ICF in June 2008, well after the events that are the subject of this lawsuit.

**13.** As mentioned above, plaintiffs have asserted that ICF management, which allegedly included the non-diverse Quadel defendants, changed the Road Home assignment of benefits policy in order to deny eligibility to plaintiffs (and others) so that they could collect a $2 million bonus from the State for meeting certain quotas. *See,* Petition, ¶ 16.

they benefit from it by declaring the plaintiffs' benefit application ineligible. *See*, Greer deposition, Exhibit A to Non-diverse defendants' opposition, R. Doc. 27–2, pp. 75–76; Cambre deposition, Exhibit B to Non-diverse defendants' opposition, pp. 100–102; Marshall deposition, Exhibit C to Non-diverse defendants' opposition, pp. 82–83.[14] For the reasons that follow, the Court finds that the defendants' arguments have merit and that plaintiffs lack a reasonable possibility of recovery against the non-diverse defendants under state law, such that the claims against those defendants should be disregarded, resulting in complete diversity among the parties to this matter.

### (A) Prescription/peremption of plaintiffs' negligence and LUPTA claims:

First, it appears that plaintiffs' claims against the non-diverse defendants for negligence and for violations of LUPTA are not viable because they are prescribed/perempted. Negligence claims are subject to the one (1) year liberative prescriptive period set forth in La. C.C. art. 3492, which commences to run from the day injury or damage is sustained. La. C.C. art. 3492. As discussed above, plain-

tiffs allege that they filed their application for Road Home Program benefits on April 27, 2007, and that they were subsequently notified that their application was eligible for benefits. They further allege that, on August 14, 2007, Gallipoli was ordered by the non-diverse defendants to redesignate their application as ineligible, and on August 20, 2007, a notice was sent to the plaintiffs advising them that they were no longer eligible for benefits. Such notice was received by the plaintiffs, at the latest on August 29, 2007, since they allege that they objected to it in writing on that date. Additionally, because of their disagreement with the reversal of their eligibility determination, the plaintiffs appealed that determination to ICF, and their appeal was denied on February 22, 2008. The petition does not allege, and the summary judgment-type evidence presented does not reveal, any further actions by the non-diverse Quadel defendants after the February 22, 2008 denial of the plaintiffs' administrative appeal.[15] Suit was not filed until April of 2009. Because plaintiffs failed to file their negligence claim against the non-diverse defendants within one (1) year of either of the above dates, that claim is prescribed.

---

**14.** With their Notice of Removal, the ICF defendants submitted a Declaration by John Thornton, an employee of ICF and the Chief Administrative Officer of the Road Home Program since January 2007, which attested to the fact that the non-diverse Quadel defendants were "not part of ICF's management staff" and that ICF's subcontracts do not provide for bonuses of financial incentives to subcontractors, like Quadel, or to employees of those subcontractors, like Greer, Cambre and Marshall. *See*, Notice of Removal, R. Doc. 1, Ex. D.

**15.** In their memorandum in support of their motion to remand, plaintiffs explain that the "active negligence" alleged on the part of the non-diverse defendants consists of their breach of the duty to ensure that the Reese

application for benefits "was handled fairly and in compliance with law." Plaintiffs contend that the non-diverse defendants "actively caused the[m] harm ... and then deliberately covered it up by refusing to satisfy the legal obligation to process the Reese Application appropriately." *See*, R. Doc. 22–11, pp. 28–29. Thus, the improper processing of the Reese application is the negligence alleged, and all activity relating to the processing of that application on the part of the non-diverse Quadel defendants concluded with the denial of the plaintiffs' administrative appeal on February 22, 2008. At that point, plaintiffs appealed the benefits determination to the State, and the processing of plaintiffs' application was out of the non-diverse defendants' hands at that point.

Furthermore, the plaintiffs' LUPTA claim is subject to the peremptive period set forth in La. R.S. 51:1409(E), which provides that an action under LUPTA is prescribed by one (1) year running from the time of the transaction or act which gave rise to the right of action. *Bladen v. C.B. Fleet Holding Co.*, 487 F.Supp.2d 759 (W.D.La.2007)(holding that the private cause of action for damages set forth in LUPTA is subject to a one year *peremptive* period, despite the use of the word "prescribed" within the Act). Since the only acts attributed to the non-diverse Quadel defendants occurred between August 14, 2007 and February 22, 2008, plaintiffs' LUPTA claim against them is preempted since it was not filed until over a year later, on April 20, 2009.[16]

■ The Court also finds that the doctrine of *contra non valentem* and plaintiffs' "continuing tort" theory do not apply to save their negligence and LUPTA claims against the non-diverse defendants from prescription/preemption.[17] First, since LUPTA claims are subject to a *preemptive* period, the equitable doctrine of *contra non valentem* simply does not apply to those claims. *Dominion Exploration & Production, Inc. v. Waters*, 07–386 (La.App. 4 Cir. 11/14/07), 972 So.2d 350, 362. Secondly, such doctrine does not apply to save plaintiffs' negligence claim from the prescriptive bar because, under the "discovery rule" of the *contra non valentem* doctrine, prescription begins to run when the injured party "discovers or should have discovered *the facts upon which his cause of action is based*," and a plaintiff is deemed to know what he could have learned through reasonable diligence. *Fred's Inc.*, 18 So.3d at 178 [Emphasis added].

■ The Court finds that the facts underlying plaintiffs' negligence claim against the non-diverse defendants (*i.e.*, that their benefits eligibility determination was improperly changed to one of ineligibility) were either known or reasonably knowable to the plaintiffs when they received the August 20, 2007 notice advising of the change in their eligibility status, or

---

16. Although the plaintiffs have spent much time in their supporting memorandum discussing whether they have alleged facts supporting a valid cause of action against the non-diverse defendants under state law (*i.e.*, the plaintiffs contend they have alleged that each of the non-diverse defendants was "personally engaged in actions designed to, and which did, result in the fraudulent and tortious rejection of the Reese application [the personal direction to Gallipoli to reverse an otherwise proper determination of eligibility to a determination of ineligibility"]), they have completely failed to address the issue of whether those claims were actually timely-filed under state law. Even assuming plaintiffs have alleged facts that state recognized causes of action under state law, the non-diverse defendants can nevertheless be considered improperly or fraudulently joined if the claims against them are prescribed/preempted since the plaintiffs have no arguably reasonable basis for recovering on claims that are time-barred.

17. The doctrine of *contra non valentem* applies in four (4) circumstances: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceeding which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; or (4) where the cause of action was neither known nor reasonably knowable by the plaintiff even though the plaintiff's ignorance was not induced by the defendant (the "discovery rule"). *Fred's, Inc.*, 18 So.3d at 175. There is no indication that the first three (3) categories of *contra non valentem* have any application herein. The third category only applies when the defendant has engaged in some conduct that prevents the plaintiff from availing himself of his judicial remedies, which has not been alleged herein.

by February 22, 2008, when their administrative appeal concerning the eligibility determination was denied by ICF.[18] At that point, even though plaintiffs may not have had knowledge of all facts supporting their negligence cause of action, they had notice of sufficient information to excite their attention and reasonably put them on guard and call for inquiry that their benefits application had been improperly handled by ICF and Quadel personnel, such that they should have filed their negligence claim against the non-diverse defendants within one (1) year. *Safford v. Paine-Webber, Inc.*, 730 F.Supp. 15 (E.D.La. 1990); *Allstate Ins. Co. v. Fred's, Inc.*, 18 So.3d 172 (La.App. 2 Cir.2009)(When a party has sufficient information to incite curiosity, to excite attention, or to put a reasonably minded person on guard and call for inquiry, he or she has the constructive knowledge necessary to start the running of liberative prescription).

■ As to plaintiffs' "continuing tort" theory, it does not apply to save their negligence claims from prescription either since the cause of the injury in this case (*i.e.*, the changing of plaintiffs' eligibility determination to one of ineligibility) is not a "continuous one giving rise to successive damages," but instead the cause and the damages alleged in this case occurred at a precise point in time. *See, Watters v. Department of Social Services*, 15 So.3d 1128, 2009 WL 1709582 (La.App. 4 Cir.2009)(Under the "continuing tort" doctrine, when the cause of injury is a continuous one

giving rise to successive damages, prescription does not begin to run until the conduct causing the damages is abated); *Bustamento v. Tucker*, 607 So.2d 532, 543, n. 8 (La.1992). Furthermore, even if prescription on plaintiffs' negligence claim commenced to run when the alleged wrongful conduct by the non-diverse Quadel defendants was abated, as is the case with the "continuing tort" doctrine, that occurred either when the plaintiffs' benefits determination was changed to ineligible (August 20, 2007) or when the plaintiffs' administrative appeal was denied (February 22, 2008), both of which occurred over one (1) year before the plaintiffs filed suit.

■ Moreover, to the extent plaintiffs contend that the non-diverse defendants engaged in a "continuing tort" because they had a duty to "report wrongful conduct and/or improper application processing," which they "steadfastly failed or refused to do," and that they have "continuously retained [ ] wrongful sums" from the $2 million bonus, the Court agrees with defendants that such contentions lack merit. Because the non-diverse defendants did not know about or receive any money from the alleged $2 million bonus, they cannot be held liable for "continuously retain[ing]" sums derived from that bonus. Additionally, the failure to report and correct an allegedly negligent act (here, the failure to report and correct the allegedly improper changing of the plaintiffs' eligibility de-

---

**18.** Even if the plaintiffs were not aware of the non-diverse defendants' alleged fraudulent conduct at that time (*i.e.*, that they were involved in a fraudulent scheme to obtain bonus money in exchange for changing plaintiffs' benefits determination), plaintiffs were certainly aware of their contention that their benefits determination had been wrongfully and negligently changed, or they would not have objected to and appealed that determination. Plaintiffs allege that Gallipoli told

Judge Reese, in May 2008, that their application was denied so that the defendants could receive the alleged $2 million bonus; that May 2008 date therefore appears to be the date when plaintiffs would have learned of their delictual fraud claim, not their negligence claim. *See*, Petition, ¶ 23. Thus, while their negligence claim against the non-diverse defendants was untimely filed, their delictual fraud claim appears to have been timely filed based upon the facts alleged in the petition.

termination) does not constitute a "continuing tort." *See, Crump v. Sabine River Authority,* 737 So.2d 720 (La. 1999)(Breach of the duty to right a wrong and make the plaintiff whole cannot be a continuing wrong which suspends the running of prescription, as that is the purpose of any lawsuit and the obligation of every tortfeasor).[19] For all of the above reasons, the plaintiffs' negligence and LUPTA claims against the non-diverse defendants appear to be prescribed/perempted, and the plaintiffs therefore do not have a reasonable possibility of recovery on those claims.

**(B) Plaintiffs' delictual fraud claim:[20]**

 The elements of a delictual fraud or intentional misrepresentation claim under Louisiana law are: (1) a misrepresentation of material fact, (2) made with the intent to deceive, and (3) causing justifiable reliance with resultant injury. La. R.S. 13:3201; *Guidry v. U.S. Tobacco Co., Inc.,* 188 F.3d 619 (5th Cir.1999). The plaintiffs do not specifically allege that any of the non-diverse Quadel defendants made a misrepresentation of material fact to them. Instead, they allege that "representatives of ICF, defendants Al Blakenship, Frank Abramchek and others" informed Mr. Reese that the change in his benefits determination was due to a "policy shift," which actually was not an "innocent policy change" but instead was part of a deceptive scheme, and that such misrepresentation deprived them of benefits that they were rightfully owed, while enriching the defendants. Since the non-diverse defendants have testified that they were all employed by Quadel during the relevant time period, that they have never been a part of ICF management, and that they have never taken part in decisions by

---

**19.** *Miller v. Conagra, Inc.,* 2008–0021 (La.9/8/08), 991 So.2d 445 ("A continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act"); *Thomas v. State Employees Group Benefits Program,* 2005–0392 (La.App. 1 Cir. 3/24/06), 934 So.2d 753, 758; *Pinero v. Jackson Hewitt, Inc.,* 2009 WL 1067034 (E.D.La. 2009)(If the "operating cause" of the damage is discontinuous in nature, even if the damage is continuous, the continuing tort theory is inapplicable, and "prescription runs from the date that knowledge of such damage was apparent or should have been apparent to the injured party"); *O'Gea v. Home Depot USA, Inc.,* 2009 WL 586124 (E.D.La.2009)(Home Depot had no continuing duty to the plaintiff after it terminated his employment. If Home Depot unlawfully discriminated against the plaintiff and refused to remedy the discrimination amicably, the plaintiff could obtain a court-ordered remedy by filing suit, but Home Depot's refusal to acknowledge the merits of the plaintiff's discrimination claim and its defense of the lawsuit is not considered continuing tortious conduct).

**20.** As mentioned above, although the Court finds that plaintiffs' negligence claim against the non-diverse defendants is prescribed, the same determination cannot be made with respect to plaintiffs' delictual fraud and unjust enrichment claims since commencement of the prescriptive period relative to those claims would involve some degree of actual or constructive knowledge on the plaintiffs' part that the non-diverse defendants were involved in a deceptive scheme in changing the eligibility determination. Plaintiffs did not necessarily have knowledge of facts sufficient to put them on guard and call for inquiry concerning a deceptive scheme at the time they received notice of the change in the benefits determination or when their appeal was denied. Based upon the allegations in the petition, it appears that plaintiffs acquired knowledge of the alleged deceptive scheme when Gallipoli contacted Mr. Reese in May 2008 and informed him that the plaintiffs' application had been changed from eligible to ineligible, not in order to comply with existing rules and regulations, but rather to dispose of the application and many others like it so that the defendants could collect the $2 million bonus. *See,* Petition, at ¶ 23. Since the plaintiffs filed their delictual fraud and unjust enrichment claims within a year of obtaining knowledge of that "deceptive scheme," in April 2009, those claims appear to be timely-filed.

ICF's management, there is not a reasonable possibility that they can be held liable under plaintiffs' allegation that "representatives of ICF" made a misrepresentation to them about a "policy shift." [21]

Furthermore, even assuming the plaintiffs can prove that the non-diverse defendants could somehow be considered "ICF management" by virtue of the fact that they exercised a degree of supervision over some ICF employees or that the management and personnel of ICF and Quadel were so intertwined that the non-diverse defendants could be considered management of both ICF and Quadel,[22] the plain-

21. Although plaintiffs argue in their memorandum in support of their motion to remand that ICF management and personnel were "inextricably intertwined" with Quadel management and personnel, "without any demarcation of authority so as to render the identity of the company that employed the [non-diverse] Defendants pointless," they do not refer to any allegations in the petition or any specific evidence supporting that argument. More particularly, they do not allege or point to any evidence demonstrating that the non-diverse defendants, who were undisputedly employed by Quadel during the relevant time period, had any policy decision-making authority on behalf of ICF, such that they could be held responsible for the alleged wrongful policy change concerning assignments of Road Home Program benefits. Instead, the petition itself alleges that the wrongful change in policy governing assignment of rights to Road Home benefits to meet the State's deadlines/quotas was "made and executed" by "management personnel of ICF."

22. During her deposition, Greer testified that she was employed by Quadel as a Program Director. See, Exhibit F to plaintiff's remand motion. One of her responsibilities was to act as Appeals Manager of the Road Home Program, and in that capacity, she oversaw the entire administrative appeals process in the Road Home Program and supervised both ICF and Quadel employees in the handling of such administrative appeals. Id., pp. 22–23. In turn, Greer reported to an ICF manager, Amy McGimsey. Id., p. 25. Greer admitted that she was personally involved in the plaintiffs' appeal of the denial of their benefits application; that she provided information on such appeal to another defendant, Donna Migoni; and that the Appeal Determination Report denying the appeal was sent out under her authority as Appeals Manager. Id., pp. 63–68. Such facts could be used by plaintiffs in an effort at demonstrating that Greer had managerial responsibility over the denial of plaintiffs' application and appeal, even if she was not actually a member of ICF manage-

ment. However, even if that fact was established, plaintiffs could only potentially establish negligence on Greer's part since there is no evidence that she had any knowledge of the alleged $2 million bonus scheme, and any negligence claim against her is prescribed because her acts concluded with the termination of the administrative appeals process, which ended over a year prior to the plaintiffs filing suit.

Similarly, Marshall was employed by Quadel as a Regional Manager for the Road Home Program, and in that capacity, she supervised both ICF and Quadel employees. See, Exhibit H, pp. 24–27. She later moved into the position of Special Project Manager, in which she reported to Greer. Id., p. 29–31. In that capacity, she worked on administrative appeals that were "stuck in the process." Id., p. 30. Edwards testified that she worked on the Reese application appeal with Gallipoli and Ransom. Id., p. 52, 55. She further testified that the Appeal Determination Report regarding the Reese application was the only such report that she has ever signed. Id., p. 55–56. She further indicated that she signed the report as an "analyst," a person who typically researches the appeal and prepares the report, even though she did not prepare that report. Id., p. 69–70. As with Greer's testimony, even if the plaintiffs could use Marshall's testimony to show that she exercised managerial responsibility over the Reese administrative appeal and that she improperly carried out that responsibility, such demonstration would only reveal negligence on her part, which claim is prescribed. There is no evidence that, in handling the Reese appeal, Marshall had any knowledge of the alleged deceptive scheme to obtain the $2 million bonus.

Finally, Cambre testified that, while she was employed with Quadel as a Consultant Manager, she supervised the Dispute Resolution Group, which researched certain application files to determine whether the applications were eligible for benefits after disputes

tiffs would nevertheless be unable to prove that the non-diverse Quadel defendants had an intent to deceive them. The theory underlying plaintiffs' delictual fraud claim is that the non-diverse defendants instructed Gallipoli to change the plaintiffs' eligibility determination to ineligible so that they could benefit from a $2 million bonus awarded by the State. Each of the non-diverse defendants specifically testified, however, that they had no knowledge of the alleged $2 million bonus awarded by the State. Furthermore, there is no evidence that any of the non-diverse defendants benefitted from such bonus. Accordingly, the alleged, deceptive $2 million bonus scheme could not have been the motive or intent for any decision by them to change the plaintiffs' benefits determination. As such, plaintiffs' delictual fraud claims against the non-diverse defendants would fail.

### (C) Unjust enrichment claims:

 The elements of an unjust enrichment claim are: (1) an enrichment of the defendant; (2) an impoverishment of the plaintiff; (3) a connection between the enrichment and the resulting impoverishment; (4) an absence of justification or cause for the enrichment and impoverishment; and (5) there must be no other remedy at law available to the plaintiff. *Garber v. Badon & Ranier,* 2007–1497 (La. App. 3 Cir.2008), 981 So.2d 92. Similar to the plaintiffs' delictual fraud claim, their claim for unjust enrichment fails with the

first element based upon the fact that the non-diverse defendants were unaware of and did not participate in the alleged $2 million bonus scheme. Because the plaintiffs will be unable to prove that the non-diverse defendants were "enriched" by the change in their eligibility status, they have no viable claim against them for unjust enrichment.

### III. Does the *Smallwood* doctrine apply to preclude a finding of improper joinder?

In *Smallwood,* the Fifth Circuit held that, where a non-diverse defendant establishes that it was improperly joined by way of a showing that equally and necessarily disposes of claims against the diverse defendants, there is no improper joinder because the defendant has simply demonstrated that the plaintiff's entire case is without merit, and an improper joinder inquiry concerns subject matter jurisdiction, rather than the merits of the entire case. *Smallwood,* at 575–576. The Fifth Circuit subsequently clarified the *Smallwood* "common defense doctrine" in *Boone v. Citigroup,* 416 F.3d 382, 391–92 (5th Cir.2005), wherein it held that such doctrine only applies where the showing that forecloses the plaintiff's claims against the non-diverse defendant necessarily and equally compels foreclosure of *all of the plaintiff's claims* against *all of the diverse defendants. Id.*

arose. In such capacity, she supervised both ICF and Quadel employees. See Exhibit I, p. 32–33, 39–40. Cambre instructed the employees she supervised on process-related issues concerning eligibility determinations, but she did not have any responsibility to instruct employees on policy issues. *Id.,* pp. 43–44. Cambre admitted that she was involved with the administrative appeal of the Reese Application in that she gathered documents relating to the application and had a discussion with Gallipoli about it after upper manage-

ment in Quadel requested information from Cambre about the file. *Id.,* p. 76–77. Again, while Cambre's testimony indicates that she had some level of managerial responsibility over both ICF and Quadel employees, she did not have any responsibility related to policy issues, such as the alleged change relative to the assignment policy at issue in this case. Furthermore, although she had a discussion with Gallipoli about the Reese application, there is no indication by Cambre as to what the substance of that conversation was.

The undersigned's above findings, which foreclose plaintiffs' claims against the non-diverse Quadel defendants, do not necessarily and equally compel the foreclosure of all of the plaintiffs' claims against the remaining ICF defendants. While the plaintiffs' LUPTA claim is perempted as to all defendants based upon La. R.S. 51:1409(E), the reasons why the plaintiffs' delictual fraud and unjust enrichment claims against the non-diverse defendants have been deemed foreclosed (*i.e.*, that the non-diverse defendants were not part of ICF management and did not make policy making decisions on its behalf as well as that they did not know of and participate in the alleged $2 million bonus scheme) do not necessarily dispose of those claims in relation to the ICF defendants. The arguments asserted by the non-diverse defendants and the remand-related discovery do not address whether or not the named ICF defendants were, in fact, members of ICF management who made and implemented the policy decision concerning assignments of benefits that is in question. Moreover, such arguments and discovery do not reveal whether the named ICF defendants had knowledge of and benefitted from the $2 million bonus scheme, as alleged in the petition. Accordingly, the Court finds that the *Smallwood* "common defense doctrine" does not apply herein to preclude a finding of improper joinder.

## IV. Should plaintiffs' request for leave to amend their petition be granted?

In their motion to remand, plaintiffs alternatively request that they be permitted to amend their petition to "name Quadel as the [non-diverse defendants'] employer." The Court agrees with defendants that granting such request would be futile and would not do anything to establish that plaintiffs have viable claims against the non-diverse defendants. Even if the Court was to grant the requested leave and allow plaintiffs to amend the petition and clarify that Quadel was the non-diverse defendants' employer, plaintiffs' negligence and LUPTA claims against Quadel and the non-diverse defendants would still be prescribed/perempted. Furthermore, their claims for delictual fraud and unjust enrichment would still be foreclosed based upon the fact that none of the non-diverse defendants were aware of the $2 million bonus scheme.

Additionally, to the extent plaintiffs might have viable claims against Quadel and they are attempting to add Quadel as a defendant to destroy complete diversity of citizenship, they will be unsuccessful in that effort even if the undersigned was to grant leave to amend. First, Quadel is a non-Louisiana corporation and therefore a diverse defendant relative to the plaintiffs. Finally, the citizenship of Quadel could not be considered in making the jurisdictional determination in any event since, in making that determination, the undersigned is only permitted to consider the claims as they existed at the time of removal. Accordingly, plaintiffs' request to amend their complaint to add Quadel as a defendant should be denied.

## RECOMMENDATION

It is recommended that the Motion for Remand to State Court (R. Doc. 22) filed by plaintiffs, Kern A. Reese and Dorothy F. Reese, be **DENIED** and that the presence of the non-diverse defendants, Rebekah Cambre, Agatha Marshall, and Joan Greer, be ignored for purposes of diversity jurisdiction.

It is further recommended that the plaintiffs' alternative request to amend their petition be **DENIED.**